**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **TECHNOLOGY HOLDINGS CORPORATION, INC., MIDWAY SOFTWARE SYSTEMS, LLC, MUSTANG SOFTWARE, LLC, AND 239 SOFTWARE, LLC** | § | |
| **Plaintiffs,** | § | **Cause No. 1:26-cv-2966** |
| **v.** | § | **JURY TRIAL DEMANDED** |
| **SFS IT SERVICES, INC., SEMPER FIDO SWEEPSTAKES LLC, CODY ROGERS AND MORRIS JOSEPH, INDIVIDUALLY,** | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiffs Technology Holdings Corporation, Inc. ("Plaintiff THC" or "THC"), Midway Software Systems, LLC ("Midway"), Mustang Software, LLC ("Mustang"), and 239 Software, LLC ("239Soft") (collectively, "Plaintiffs") bring this action against SFS IT Services, Inc. ("SFS"), Semper Fido Sweepstakes LLC ("Semper Fido"), (collectively, "Operator Defendants"), Cody Rogers ("Defendant Rogers"), and Morris Joseph ("Defendant Joseph") (Defendants Rogers and Joseph, along with Operator Defendants, "Defendants")) for misappropriation of trade secrets under Defend Trade Secrets Act ("DTSA") and Texas Uniform Trade Secrets Act ("TUTSA"), and for violations of Texas common and statutory laws, and show the following:

## I. INTRODUCTION

1. Plaintiffs developed and own very successful proprietary sweepstakes software, which it licenses to distributors across the United States. Operator Defendants and Defendant Joseph were Plaintiffs' exclusive Texas distributors for eight years. But Defendants got greedy. They no longer wanted to pay Plaintiffs their licensing fee. So, Defendants managed to steal Plaintiffs' software and sophisticated algorithms and create their own competing sweepstakes software. Defendants' misappropriation should not be countenanced, and this Court should shut Defendants down. Plaintiffs come to this Court to stop Defendants' unauthorized use of Plaintiffs' trade secrets and proprietary information.

## II. THE PARTIES

2. Technology Holdings Corporation, Inc. is a Minnesota corporation with a principal place of business located at 10800 Lyndale Ave S, Suite 324, Minneapolis, MN 55420. THC does business in this district and throughout this State.

3. Midway Software Systems, LLC is a Delaware limited liability corporation with a principal place of business located at 10800 Lyndale Ave S, Suite 324, Minneapolis, MN 55420. Midway does business in this district and throughout this State.

4. Mustang Software Systems, LLC is a Delaware limited liability corporation with a principal place of business located at 10800 Lyndale Ave S, Suite 324, Minneapolis, MN 55420. Mustang does business in this district and throughout this State.

5. 239 Software, LLC is a Delaware limited liability corporation with a principal place of business located at 10800 Lyndale Ave S, Suite 324, Minneapolis, MN 55420. 239Soft does business in this district and throughout this State.

6. Pursuant to written license agreements, Plaintiff THC licensed its Software and System to Plaintiffs' operating entities Midway, Mustang, and 239Soft (collectively, "Licensing Plaintiffs"). These entities in turn provide proprietary Sweepstakes Revealer Terminals ("SRTs") running the Software that are used for companies to promote or enhance the sale of a company's product, service or donation, like charitable sweepstakes run by civic organizations (such as the American Legion, Disabled American Veterans, Veterans of Foreign Wars) and other establishments. The combination of Plaintiff THC's sweepstakes and Software and System, along with the Licensing Plaintiffs' game terminals, SRT-related servers, and point of sale ("POS") terminals, SRTs, Software, and other equipment, is collectively referred to as the "Equipment and Software".

7. SFS IT Services, Inc. is a Texas corporation with an address of P.O. Box 813, Zephyr, Texas 76890. SFS does business in this district and throughout this State. SFS may be served through its registered agent, Jennifer S. Riggs, 3307 Northland Drive, Suite 215, Austin, TX 78731.

8. Semper Fido Sweepstakes LLC is a Texas limited liability corporation with an address of P.O. Box 813, Zephyr, Texas 76890. Semper Fido does business in this district and throughout this State. Semper Fido may be served through its registered agent, Craig L. Sims, Jr., 205 Rolling Hill Dr., La Grange, TX 78945.

9. Cody Rogers is an individual who is a resident of the State of Texas, and upon information and belief, a resident of Brown County. Defendant Rogers may be served wherever he may be found.

10. Morris Joseph is an individual who is a resident of the State of Texas, and upon information and belief, a resident of Travis County. Defendant Joseph may be served wherever he may be found.

## III. SUBJECT MATTER AND PERSONAL JURISDICTION AND VENUE

11. This Court has federal question subject matter jurisdiction, 28 U.S.C. §1331, over Plaintiffs' trade secret misappropriation claims under 18 U.S.C. §1836, the DTSA. The Court has supplemental jurisdiction, 28 U.S.C. § 1367, over Plaintiffs' state law trade secret misappropriation claims under the Texas Uniform Trade Secrets Act, Chapter 134A of the Texas Business and Commerce Code. This Court also has diversity of citizenship jurisdiction, 28 U.S.C. § 1332, over Plaintiffs' state law claims, because the amount in controversy exceeds $75,000 exclusive of interest, costs and attorneys' fees, and complete diversity of citizenship exists between all Plaintiffs and all Defendants.

12. Personal jurisdiction and venue are proper in this district, because a substantial part of the acts of trade secret misappropriation is believed to have occurred in this District and because all Defendants are Texas residents and at least one (Defendant Joseph) resides in this District. 28 U.S.C. § 1391(b)(1-2). Venue and jurisdiction for Licensing Plaintiffs' forthcoming request for injunctive relief against the Operator Defendants is governed by a forum selection clause in the contract

between the parties that calls for claims for injunctive relief to be brought in state or federal court located in Travis County, Texas.

## IV. BACKGROUND FACTS

### A. Charitable Product or Service Based Game Promotions

13. Plaintiff THC owns proprietary computer software for charitable product or service-based game promotions that it licenses to companies throughout the United States as a way for companies to enhance the sale of their products, services or donations through electronic game promotions. Sweepstakes promotions are essentially promotions attached to the sale of a business's products, services or charitable based offerings whereby businesses use a game promotion (either cash or prizes) to enhance the sale of their offerings. Game promotions are commonly known as "sweepstakes drawings." Some well-known game promotions are McDonald's "Monopoly Game" and "My Coke Rewards." Such promotions incentivize customers to obtain a product or service with a specific reward, but "no purchase is necessary" to participate. THC's computer software permits its licensees to offer similar no-purchase-necessary game promotions through electronic mediums while utilizing enhanced entertaining displays to communicate the results.

14. THC's computer-based sweepstakes software capitalizes on the promotions that a specific company wants to offer its customers to boost or enhance the sales of that product, service or charitable offering. THC creates entertaining displays to communicate the results to each player. THC's proprietary "Game Display" method of promotion operates as follows:

a. A customer learns of a product, service or charitable based sweepstakes offering and travels to the offeror's place of business. The potential customer is drawn to the offeror for two reasons: (1) the possibility of winning a prize or cash. and (2) the excitement involved with the "Game Display" method of revelation.

b. Upon arriving at the business, the potential customer may do one of two things. The customer may purchase the business's product or service or make a donation that has free entries attached to that product, service or donation. For example, if a Donation of $1.00 is made under the Charitable model, there would be 100 Free Entries attached to that Donation. Alternatively, the customer may elect not to purchase the business's product, service or make a donation, but simply participate in the sweepstakes promotion by requesting free entries because no purchase is necessary to participate. If the potential customer wishes more entries, he or she may obtain them by requesting more free entries if still available within a specific 24-hour period. Purchasing the product, service or making an additional donation will always have free entries attached to it which become available to reveal.

c. The customer is provided the opportunity to find out whether he or she "wins" by utilizing the entertaining game display interface or do an "Instant Reveal" at the point-of-sale terminal and bypass the entertaining display portion of the software. Customer is provided a PIN Number to access their account that directly correlates to the amount of the products, services or donation that was purchased or made.

d. When the customer types in his or her PIN Number at an assigned computer terminal, that computer is "unlocked."

e. The customer is then taken to a screen that displays a grid of various entertaining game displays.

f. The customer next selects one of the entertaining game displays to play. For reference, the analogy is choosing one specially marked bottle to open similar to My Coke Rewards.

g. That game is then played to reveal the results of the free entries offered by the business or charity. The request to reveal is then sent over the internet to a central server; at which point the server "checks" whether the particular entry is one of the predetermined "winners."

h. The central server then communicates the result back to the desktop computer or phone with the result.

i. Whether the customer is a "winner" or "loser," THC's entertaining game displays will provide the result to the customer in a manner that is intended to be exciting and fun. This method of communicating results is a way to engage the customer and indicate game promotion results to the consumer using entertaining images rather than words or numbers and offers the appeal of visual connections.

## B. Plaintiffs' Proprietary System, Software, Reel Strips, and Math Models

### 1. The System and Software

15. THC owns, designs, and licenses fully integrated video-based electronic sweepstakes software for use by companies to enhance or promote the sale of a product, service or donation. THC has engineered a server-based, electronic game promotions software system that includes proprietary mathematical models (the "Math Models"), original images including artwork (the "Original Works"), and unique game titles with proprietary names, themes, images, and sounds (the "Games") (collectively, the "Software").

16. The Software is designed to be hosted on a network consisting of: (a) a central server that THC owns and controls; (b) a point-of-sale terminal; (c) computer terminals for use by customers; and (d) a management terminal (the "System"). The Software is used by each component of the System to ensure proper functioning. This System and Software are accordingly fully integrated.

17. The core of the System is a complex, proprietary arrangement of server-based Software that contains the foundational structure for the functioning of an electronic game promotion system that includes, but is not limited to, the highly confidential Math Models. It also contains game functionality elements and related data processes for the System to function. The System is also modular in design.

18. With access to and knowledge of the Software's code, it is possible to design new Games with different images or modify the images of existing games while still relying upon the same design and Math Models contained in the Software. The Games are considered "skins" that provide the color, animation, and sound to a customer, while the core software is the "brain" that actually runs the Games and performs the complex calculations necessary for the System to function. Adding graphics or "skins" to an already functioning system (like THC's System) are merely "plugins" and is a simple task to undertake. It is possible for Games to be functioning using part or all of the Software regardless of whether the images and sound that appear are similar.

19. The System uses databases the Software generates containing one or more finite pools of game promotions entries stored on the network server. Upon creation of a pool, the Software associates certain entries with prize value, while it associates others with no prize. The Software's creation and allocation of the pools is a function of the Math Models. The Software causes the pools to be stored on the System server(s) until an end-user accesses them through a computer terminal.

20. The Software manages the entries in each finite pool as end-users access the System to reveal their entries. The Software further manages provision of the prizes to end-users as they become entitled to them.

21. The System is an integrated combination of elements that all function together to deliver the experience described above. THC has devoted substantial time and resources to the design of the System and Software as a whole, as well as each

component within. Each component of the System is interconnected to the others. The point-of-sale terminals, servers, and individual user terminals each contain unique and proprietary Software necessary for the System to function as designed.

**2. Software's Reel Strips and Math Models**

22. Plaintiffs' Software includes reel strips ("Reel Strips") and Math Models (the mathematical algorithms that run sweepstakes games) that determine the order of symbols on a reel strip, the reel stops for each play of the game, and the distribution of prizes. These elements make a game unique and differentiate more successful games from less successful games. More successful games keep players engaged and wanting to purchase more products, services or make additional donations to obtain additional sweepstakes entries, which results both in happier players and more money being generated by the business or sent to the charitable beneficiary of the sweepstakes game. For this reason, software developers like Plaintiffs closely guard the Math Models behind their games as trade secrets.

23. A reel strip is a long list of letters or numbers that translates to a symbol of the game found in help or information screen. A game usually consists of five-reel strips for the reels you first see when you enter a game. Reels windows usually show 15 symbols (3 symbols on each of 5 reel strips) to the player while the rest are hidden.

24. Plaintiffs' StealthX games are all electronic. For each of the reel strips, there is a set order and finite number of potential combinations of symbols. For StealthX software, the number of positions can range between 30-160 different symbols per reel strip, even though each reel strip only displays three (3) symbols per spin. For each game, the symbol order is the same for every player.

25. Reel stop positions are important, because they are a shorthand way to tell a game exactly where to stop so various prizes can be awarded. Because a reel strip usually consists of 30 or more symbols, knowing where the game needs to stop along the reel strip determines what prize a player will win.

26. As a hypothetical, consider a single reel strip using 3 different symbols (Dog-Cat-Fish) and a total of 6 positions (0-5) with a reel window that shows 3 symbols:

| Reel Position | Symbol |
|---|---|
| 0 | Dog |
| 1 | Cat |
| 2 | Fish |
| 3 | Cat |
| 4 | Dog |
| 5 | Fish |

If this reel strip was told to stop on reel stop zero, the player would see Dog-Cat-Fish from top to bottom in the three (3) symbol reel window. Reel stop one would show Cat-Fish-Cat, two would show Fish-Cat-Dog, three would show Cat-Dog-Fish, four would show Dog-Fish-Dog, and five would show Fish-Dog-Cat.

### 3. Plaintiffs Protect Their Proprietary System, Software, Reel Strips and Math Models as Trade Secrets

27. Competition is fierce in the electronic game promotion industry. Competitive advantage in the industry depends largely on the quality of the customer experience using the Software and System. As such, the Software and System derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another who can obtain economic value from the disclosure or use of the Software and the System.

28. For more than 10 years, THC has developed its System and its Software, making it entirely unique and original in the marketplace. As a result, the Software includes certain unique or hidden features that are the result of the way it was developed, designed, and engineered. Some of these features are visible to users, while others are only ascertainable in the code and database structure itself, and can only be accessed by a trained software programmer or engineer with access to and knowledge of the code. The hidden features were purposefully designed to be concealed in order to prevent illegal copying or piracy of the Software.

29. Plaintiffs use various safeguards to protect their Software, including its Reel Strips and Math Models. Only employees that work in the Dallas, Texas office have access to the direct code to keep direct access to a bare minimum and on a need-to-know basis. Plaintiffs use a program called Smart Assembly, written by Redgate Software, to obfuscate their code. Plaintiffs have a strict policy that any software bundle that leaves the Dallas office goes through the obfuscation process.

30. The StealthX software also has built in authorization protocols that generate a specific GUID (global unique identifier) based on the computer hardware of any computer running StealthX. Once a connection to a server is formed from StealthX software, the server determines if that connection is authorized. If not, the software does not continue to run and stops all execution until the server grants access. This requires manual authorization in Plaintiffs' backend web software as well as a server restart to update the list of authorized computers. The code forming this core of the Software is never seen by customers participating in the sweepstakes

game promotion, nor is it available to licensees. Access to the server is only available by using sophisticated password protection mechanisms not readily available to the public or licensees of the Software.

31. Plaintiffs license their Software to distributors through Software License Agreements ("SLAs"). As discussed below, Plaintiffs' SLAs include provisions regarding software ownership by Plaintiffs and the proprietary nature of Plaintiffs' software. *See* Section IV.D, below. As if there is any doubt, licensees are put on notice that Plaintiffs own the Software, the Software is a trade secret, licensees must protect the Software as a trade secret, and licensees may not retain the Software once the SLA has been terminated. *See id.*

32. Plaintiffs accordingly have taken reasonable measures to keep the Software secret.

### C. Operator Defendants Contract With Plaintiffs To Provide Electronic Sweepstakes to Business Establishments Within the State of Texas

#### 1. The Exclusive Software License Agreement

33. On April 28, 2018, Plaintiff Midway entered into an Exclusive Software License Agreement (along with its amendments, the "ESLA") with Operator Defendants' predecessor in interest Southwest Sweepstakes, which, upon information and belief, was owned and operated by Defendant Joseph.[1] Defendant Joseph signed the ESLA on behalf of Southwest Sweepstakes. Subsequently, on May 1, 2021, May 4, 2021, and March 11, 2025, there were amendments to the original

[1] *See* ESLA, attached hereto as Exhibit 1 and incorporated by reference as if fully set forth herein.

ESLA ("Amendment One", "Amendment Two", and "Amendment Three") adding and removing parties to the ESLA. After the three amendments, the parties to the ESLA were the Licensing Plaintiffs and the Operator Defendants. By virtue of the amendments, all Licensing Plaintiffs had the same rights under the ESLA as Midway, and all Operator Defendants had the same responsibilities as Southwest Sweepstakes. Defendant Joesph signed all of the Amendments on behalf of his various companies.

34. Under the ESLA, the parties acknowledged Licensing Plaintiffs' trade secret and proprietary Software, Systems, and Equipment:

> Whereas MIDWAY is a manufacturer of proprietary Sweepstakes Revealer Terminals ("SRTs"), and sweepstakes and amusement software ("Software"), including but not limited to game terminals, SRT-related servers, and point of sale (POS) terminals (SRTs, Software, and other equipment hereinafter collectively referred to as "Equipment and Software").[2]

35. By contrast, Operator Defendants did not have their own Software, Systems, or Equipment. Rather, the Operator Defendants entered into the ESLA "to provide electronic sweepstakes to business establishments within the State of Texas ("OPERATOR'S Customers")."[3]

36. Numerous provisions in the ESLA made clear Licensing Plaintiffs controlled and owned the proprietary Software and Equipment:

> 1. Equipment and Software/Exclusivity. *MIDWAY shall supply to OPERATOR the Equipment and Software that is to be placed on location at OPERATORS OR OPERATOR'S Customers' locations within the state of Texas.* MIDWAY shall also supply the server as part of the Equipment and Software, but the

[2] ESLA, Exhibit 1 at 1.
[3] *Id.*

server may be remote or local. MIDWAY shall be OPERATOR's exclusive provider of SRTs and Software, except as specifically authorized by MIDWAY.

3. Title to Software. The Software supplied by MIDWAY pursuant to this Agreement shall at all times remain the sole and exclusive property of MIDWAY, notwithstanding that it may hereafter be installed on Equipment furnished by the OPERATOR. As such, the Software is not subject to ownership or encumbrances by the OPERATOR or OPERATOR's customers or any other person or entity. All Equipment and/or any other material furnished by MIDWAY shall be returned to MIDWAY at the termination of this Agreement in the same condition in which it was delivered, excepting reasonable wear and tear. *OPERATOR is strictly prohibited from retaining all or any portion of the Software after the termination of this Agreement, including any copies of any portion of the Software, including but not limited to its source code, methods of operation, algorithms and artwork.*

4. Service and Updates. OPERATOR hereby agrees that representatives of MIDWAY are authorized to enter the locations at any reasonable time *to service the Equipment and Software so as to maintain it in operating condition at all times, and to make any necessary modifications or updates to the Equipment and Software*. In addition, OPERATOR and OPERATOR's Customers hereby agree to assure that any SRT-related server(s) on location at OPERATOR's or OPERATOR'S Customers' locations will be connected to the Internet at all times so that MIDWAY may monitor the activity on same, and MIDWAY may access the SRT-related server(s) via the Internet to perform necessary modifications or updates as necessary in accordance with guidelines established by MIDWAY.

5. Operator and Operator's Customer's Responsibilities. Once Equipment and Software is installed at a location, the OPERATOR and OPERATOR'S Customers shall be responsible for: (a) keeping the location clean, (b) *maintaining appropriate surveillance and security with respect to the Equipment and Software*, …

17. Protection of Trade Secrets and Confidential Information. The Parties acknowledge and agree that through the performance of this Agreement each Party may have access to various trade secrets and confidential business information of the other Party or the other Party's affiliates (including subsidiaries, parents, and their respective affiliates), business associates, officers, directors, and/or employees (collectively, "Confidential Information"). *The Parties agree that they will use such Confidential Information of the other Party solely in connection with their respective obligations hereunder and shall maintain in strictest confidence and shall not use or disclose any such Confidential Information, except in furtherance of the Party's duties hereunder, directly or indirectly or use such Confidential Information of the other Party in*

> *any other way during the term of this Agreement or for five years following the expiration or termination of this Agreement. The Parties further agree to take all reasonable steps necessary to preserve and protect the Confidential Information of the other Party*. The provisions of this Section shall not apply to information which (i) is or becomes generally available to the public other than as a result of a disclosure by a Party, its affiliates, employees, agents, or advisors in violation of this Agreement, or (ii) becomes available to a Party from a third party having the right to make such disclosure. Upon any termination of this Agreement, each Party will promptly return to the other Party all data, materials, and other property, including Confidential Information that has been reduced to tangible form, of the other Party.
>
> 18. Injunctive Relief. *OPERATOR acknowledges and agrees that it would be difficult to fully compensate MIDWAY for damages resulting from the breach or threatened breach of the covenants of this Agreement, and that any such breach would cause MIDWAY irreparable harm. Accordingly, MIDWAY will be entitled to seek injunctive relief, including but not limited to temporary restraining orders, preliminary injunctions and permanent injunctions, to enforce the terms thereof, without the need to demonstrate irreparable harm.* This right to injunctive relief will not, however, diminish any of MIDWAY's other legal rights under this Agreement or applicable law. Venue and jurisdiction for any injunctive relief under this paragraph shall lie in federal or state court located in Travis County, Texas, and shall not be governed or limited by the arbitration clause above, to the extent necessary to secure injunctive relief.[4]

**2. Plaintiffs' Trade Secret Software Provided to Defendants**

37. Under the ESLA, Licensing Plaintiffs provided Operator Defendants with more than a dozen unique Games running on Plaintiff THC and Licensing Plaintiffs' StealthX Software, which included Plaintiffs' proprietary Reel Strips and Math Models.

38. Plaintiffs' Games running StealthX Software provided to the Operator Defendants included (1) Armadillo Shootout, (2) China Street, (3) Country Lights, (4) Ducky Shamrock, (5) Forest Wild, (6) Glacier Gold, (7) Lone Star, (8) Lucky Cat, (9)

[4] *Id.*at 1, 2, 6-7 (emphasis added).

Lucky Cat Gold, (10) Lucky Star, (11) Olvera Street, (12) Pirate Squid Attack, (13) River Walk, (14) Route 66, and (15) Sin City.

**3. Defendants Terminate ESLA**

39. Defendants were Plaintiffs' exclusive operators for the entire State of Texas under an ESLA for eight years. The parties never quarreled over the terms of the ESLA. In fact, at least once Plaintiffs went above and beyond the terms of the ESLA to help Operator Defendants try to land a large customer. In that instance, Plaintiffs made substantial software changes on behalf of Defendants to prove to a potential large customer that changes were feasible and could be made. Plaintiffs did the work in good faith, and at no cost to Operator Defendants. Defendants were very satisfied with the changes, although nothing materialized with the large customer base for reasons beyond Plaintiffs' control.

40. Despite a good working relationship between the Parties, Operator Defendants gave notice in January 2026 that they would not be renewing the ESLA when it expired April 28, 2026. Defendants' termination came as a surprise to Plaintiffs.

**D. Defendants Misappropriate Plaintiffs' Trade Secret Software**

41. On information and belief, Defendants Rogers and Joseph had a plan to steal Plaintiffs' trade secrets, terminate the ESLA to cut out the license fees Defendant Joseph had to pay Plaintiffs for their SRTs and Software, and insert his "new" games into his Texas customers' facilities. Defendant Joseph and Defendant

Rogers had this plan in the works for some time and began to formally execute on it in late May 2026.

42. Upon information and belief, Defendants Joseph and Rogers laid the groundwork for their misappropriation of Plaintiffs' trade secrets at least as early as November 2025. Many of the Operator Defendants' customers had two-year contracts in place, with an automatic renewal provision, to use what the Operator Defendants identified as "SFS Sweepstakes Software" at their locations. The parties understood SFS Sweepstakes Software to be Plaintiffs' StealthX software. On or about November 11, 2025, Operator Defendants began forcing their current customers, including those who still had significant months remaining on their two-year contracts, into signing new agreements which significantly changed the terms of the agreements. Under the new agreement, Operator Defendants no longer had to provide "SFS Sweepstakes Software" but now only needed to install "Sweepstakes Software". The new agreements also added a provision that prohibited the customer from including "any other type of system [at customer's location] that is in direct competition with" SFS IT Services. The financial terms of the remainder of the agreements remained the same. Defendant Rogers, the Vice President of SFS IT Services, signed the new agreements on behalf of Defendant SFS IT Services. With new contracts in place, Defendants Rogers and Joseph would have customers for the games they created with Plaintiffs' trade secrets. Unbeknownst to Plaintiffs, Defendants Rogers and Joseph had launched their plan.

43. On January 12, 2026, the Operator Defendants, at the direction of Defendant Joseph, sent notice to Licensing Plaintiffs that Operators Defendants were terminating the ESLA, which meant the ESLA expired on April 28, 2026, and Operator Defendants ceased being Plaintiffs' exclusive SRT and Software distributors in Texas. But they did not get out of the sweepstakes and software business. Instead, on or about May 24, 2026, in the middle of the night, Operator Defendants changed the software in the SRTs to remove Plaintiffs' StealthX software and install new software called Phantom.

44. Defendants could not have been up and running with new software virtually overnight unless they had been working on stealing and utilizing Plaintiffs' trade secrets. Defendants thought they had flawlessly executed on Defendants Rogers and Joseph's plan, until Plaintiffs were able to see Defendants' code running their games.

45. When Plaintiffs first saw and played Defendants' games, they appeared to be functioning the same as Plaintiffs' games in terms of rules and features, such as bonus rounds. Upon closer inspection, Plaintiffs determined that Defendants' software is running the exact same trade secret Math Models found in Plaintiffs' Software.

46. Plaintiffs' senior software engineer ("SSE") became aware that Operator Defendants, had removed Plaintiffs' StealthX software and installed Phantom software. Because Defendants' games can be played online, SSE registered for an online account to see what had been switched. Immediately he noticed that many

games running Defendants' Phantom software were very similar in both name and themes to those games running Plaintiffs' StealthX software, in some instances calling the games the exact same thing.

47. Because of the similarity of the games running Defendants' Phantom software to those running Plaintiffs' StealthX software, SSE investigated the similarity between the two systems. SSE discovered Defendants' code had a section that had reel stop positions and identifiers for Defendants' symbols. For example, Defendants' Country Lights code included "reel_stop_positions\":[5,12,9,61,41] and "reel_symbols\":[\"kt3a3tww\",\"9ttqs9aw\",\"teqs999k\",\"jq9k9e9e\",\"tastwtnk\"].

48. In these sections of code, the instructions highlighted in yellow show the reel stop positions, and the instructions highlighted in pink correspond to the symbols shown. These code sections show the internal workings of Defendants' Phantom software and allowed SSE to determine that Defendants had copied Plaintiffs' Software.

49. SSE compared the Reel Strips from Plaintiffs' proprietary Math Models for a game called Country Lights to a game running Defendants' Phantom Software also called Country Lights. Both games have 5 Reel Strips with 91, 79, 75, 99 and 108 positions of 11 possible symbols. SSE took Defendants' Phantom reel stop positions from the game Country Lights and used them to move along Plaintiffs' StealthX Country Lights Reel Strips to find out which symbols should be shown to the player. The first time he ran the experiment, Defendant's Phantom Country

Lights code set the reel stops at positions 5, 12, 9, 61, and 41. When he compared the symbols that appeared in Defendant's Phantom-based Country Lights to the symbols that would have appeared in Plaintiffs' StealthX Country Lights, the 15 symbols matched perfectly:



StealthX Country Lights



Phantom Country Lights

Plaintiff's StealthX-based Country Lights, with Reel Stops at 5, 12, 9, 61, and 41 is shown on the left, and Defendant's Phantom-based Country Lights with the same Reel Stops is on the right. Thus, Defendants' Phantom-based Country Lights is an exact match to what would be expected from Plaintiffs' StealthX-based Country Lights Math Models.

50. SSE repeated this experiment four more times with Defendants' Phantom-based Country Lights and Plaintiffs' StealthX-based Country Lights to ensure that this was not accidental or happenstance. Each set of reel stops for

Defendants' Country Lights running Phantom was a perfect match for Plaintiffs' Country Lights running StealthX for all five of the simulations he ran.

51. SSE was then able to reproduce the same experiment for 23 of Defendants' Phantom games and correlated them to 15 of Plaintiffs' StealthX games (several of Plaintiffs' StealthX games have been copied more than once). The following is a correlation table showing which of Defendants' Phantom games have Reel Strips identical to Plaintiffs' StealthX games:

| **Plaintiffs' Game Running StealthX** | **Defendants' Game Running Phantom** |
|---|---|
| Armadillo Shootout | Pirate Treasure |
| China Street | China Street |
| Country Lights | Country Lights |
| Ducky Shamrock | Steampunk |
| Ducky Shamrock | Shamrockin Rollers |
| Forest Wild | Forest Wild |
| Glacier Gold | Glacier Gold |
| Glacier Gold | Buffalo Dynamite |
| Glacier Gold | Gold Rush Dynamite |
| Lone Star | Lucky Panda |
| Lone Star | Sirens |
| Lucky Cat | Fortune Cat |
| Lucky Cat | Golden Turtle |
| Lucky Cat Gold | Tiki Boom |
| Lucky Star | Blazing 7s |
| Olvera Street | Olvera Street |
| Olvera Street | Living Largo |
| Olvera Street | Reel Texan |
| Pirate Squid Attack | Diabla |
| River Walk | River Walk |
| Route 66 | Route 66 |
| Sin City | High Roller |
| Sin City | Oasis Gold |

52. If a competitor is so inclined, a programmer can play a game, view the help screen, and make a game with the same rules. When these types of games first

entered the market and became popular, later games were copies other companies had mimicked, but there was an important distinction: the math between the games was different. The games went into bonus rounds at different frequencies, the base game had different frequencies of the various symbols, which is all a function of the unique nature of the individual Reel Strips, which are the driving force behind the game. Reel Strips determine everything about the game from payout percentage to how volatile the game is. So, while a competitor may look at someone else's games, it is impossible without looking at the mathematical algorithm to copy one game's Reel Strips, and it is the reason that even though a game may be a replica of another game, it is not an exact copy.

53. Plaintiffs' Reel Strips for the 15 StealthX games at issue range between 50 and 105 positions with between 11 and 13 different symbols at each position. To determine how many various combinations could be created for the "simplest" of Plaintiffs' Reel Strips (50 positions with 11 possible symbols), you take the 11 possible symbols used and raise it to the 50th power ($11^{50}$), which means there are 11,739,085,287,969,531,650,666,649,599,035,831,993,898,213,898,723,001 potential combinations. The most difficult Reel Strip to copy has 105 positions with 12 possible symbols ($12^{105}$). There are 20,607,762,236,261,924,569,900,284,860,174,391,809,834, 787,151,922,826,016,542,827,824,485,411,280,867,527,241,709,344,551,333,237,746, 797,509,942,968,320 possible combinations of that Reel Strip. Copying one of Plaintiff's Reel Strips by accident would be virtually impossible. Defendants successfully copied 75 – 5 for each of the 15 games!

54. The overlap between Plaintiffs' StealthX games and Defendants' Phantom games is absolute:

| Games | Strip 1 | Strip 2 | Strip 3 | Strip 4 | Strip 5 | Symbols |
|---|---|---|---|---|---|---|
| Plaintiffs' Armadillo Shootout / Defendants' Pirate Treasure | 50 | 50 | 51 | 50 | 50 | 13 |
| Plaintiffs' China Street / Defendants' China Street | 94 | 88 | 80 | 104 | 103 | 11 |
| Plaintiffs' Country Lights / Defendants' Country Lights | 91 | 79 | 75 | 99 | 108 | 11 |
| Plaintiffs' Ducky Shamrock / Defendants' Steampunk & Shamrockin' Rollers | 50 | 50 | 50 | 50 | 50 | 11 |
| Plaintiffs' Forest Wild / Defendants' Forest Wild | 97 | 89 | 81 | 105 | 104 | 11 |
| Plaintiffs' Glacier Gold / Defendants' Glacier Gold, Buffalo Dynamite, & Gold Rush Dynamite | 97 | 89 | 81 | 105 | 104 | 12 |
| Plaintiffs' Lone Star / Defendants' Lucky Panda & Sirens | 72 | 77 | 72 | 73 | 91 | 13 |
| Plaintiffs' Lucky Cat / Defendants' Fortune Cat & Golden Turtle | 66 | 70 | 65 | 66 | 85 | 11 |
| Plaintiffs' Lucky Cat Gold / Defendants' Tiki Bloom | 66 | 70 | 66 | 67 | 85 | 11 |
| Plaintiffs' Lucky Star / Defendants' Blazing 7s | 50 | 50 | 50 | 50 | 50 | 13 |
| Plaintiffs' Olvera Street / Defendants' Olvera Street, Living Largo, & Reel Texan | 94 | 88 | 80 | 104 | 103 | 11 |
| Plaintiffs' Pirate Squid Attack / Defendants' Diabla | 50 | 50 | 51 | 50 | 50 | 13 |
| Plaintiffs' River Walk / Defendants' River Walk | 94 | 88 | 80 | 104 | 103 | 11 |
| Plaintiffs' Route 66 / Defendants' Route 66 | 91 | 79 | 75 | 99 | 108 | 11 |
| Plaintiffs' Sin City/ Defendants' High Roller & Oasis Gold | 69 | 73 | 68 | 69 | 88 | 11 |

And not only do Defendants' Phantom-based games have the same length of Reel Strips and the same number of symbols, but the symbols at each position along each reel strip are identical. There is simply no way for this to happen accidentally.

**E. Defendants' Access to Plaintiffs' Trade Secret Software**

55. Pursuant to the ESLA, Defendants had access to Plaintiffs' Software in a test lab that contained authorized machines which allowed Defendants to preview new features and games before they were pushed to Defendants' customers. This access would have given Defendants the opportunity to decompile Plaintiffs' trade secret StealthX code and steal Plaintiff's Reel Strips and Math Models.

56. Upon information and belief, Defendants took steps to de-obfuscate and de-compile Plaintiffs' software. This had to happen from a terminal instead of from the online version of Plaintiffs' games for two reasons. First, the online version of Plaintiffs' games does not show reel stop positions. Instead, the online version of Plaintiffs' games shows the symbols in the reel window only, so not only is the reel stop position unknown, but the number of reel stop positions on each reel strip is unknown. Second, not all of Plaintiffs' games are online. For example, Pirate Squid Attack is only available on terminals, so someone would need access to a terminal in order to copy its Reel Strips. As discussed above, Defendants had access to game terminals in their lab.

## V. CAUSES OF ACTION

### COUNT 1
### MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT
### (All Defendants)

57. Plaintiffs incorporate the previous paragraphs of this Complaint by reference and realleges them as originally and fully set forth here.

58. To show misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1836(b), a plaintiff must prove: (1) plaintiff owned a trade secret; (2) the information qualified as a trade secret; (3) the trade secret related to interstate or foreign commerce; (4) defendant misappropriated the trade secret; and (5) plaintiff suffered legally cognizable harm caused by the misappropriation—or qualifies for injunctive relief based on actual or threatened misappropriation.

59. As discussed above, Plaintiff THC owns trade secret sweepstakes Software. Plaintiffs' StealthX games run on Plaintiffs' proprietary and trade secret Software, which includes the highly confidential and closely held Reel Strips and mathematical algorithms that run its sweepstakes games. The Math Models determine the order of symbols on a reel strip, the reel stops for each play of the game, and the distribution of prizes. Plaintiffs' Reel Strips and Math Models are unique and not known to anyone outside of a handful of Plaintiffs' key employees. Plaintiff THC licenses its Software to Licensing Plaintiffs.

60. As discussed above, Plaintiffs safeguard their Software, Reel Strips and Math Models, since those are the most important parts of its Games. To keep direct access to a bare minimum and need to know, only employees that work in the Dallas,

Texas office have access to the direct code. Plaintiffs obfuscate their code and a software bundle does not leave the Dallas office without being obfuscated. The StealthX software also has built in authorization protocols too to protect the software from unauthorized access.

61. Plaintiffs license their software to distributors, but at all time Plaintiffs retain ownership of their software. Plaintiffs licensed its software to Defendants for distribution in Texas. Plaintiffs also license their software to other distributors in various States across the country, and many of Plaintiffs' sweepstakes games are available online.

62. As disclosed in the ESLA shown above, the Defendants were fully aware that the Software belonged to Plaintiffs, "[t]he Software supplied by MIDWAY pursuant to this Agreement shall at all times remain the sole and exclusive property of MIDWAY, notwithstanding that it may hereafter be installed on Equipment furnished by the OPERATOR."

63. Defendants were also put on notice in the ESLA that they must protect Plaintiffs' trade secrets and confidential information,

> *The Parties agree that they will use such Confidential Information of the other Party solely in connection with their respective obligations hereunder and shall maintain in strictest confidence and shall not use or disclose any such Confidential Information, except in furtherance of the Party's duties hereunder, directly or indirectly or use such Confidential Information of the other Party in any other way during the term of this Agreement or for five years following the expiration or termination of this Agreement. The Parties further agree to take all reasonable steps*

*necessary to preserve and protect the Confidential Information of the other Party.*

64. Despite knowing Plaintiffs' Software, Reel Strips and Math Models were trade secrets and confidential information and highly protected, Defendants Joseph and Rogers put a plan in place to misappropriate them for his own use and Operator Defendants' use and executed on that plan.

65. As detailed above, Operator Defendants are using Plaintiffs' Math Models, including the highly coveted Reel Strips. Defendants took the Math Models and Reel Strips from Plaintiffs' StealthX Software and are using them in their Phantom games without authorization from Plaintiffs.

66. No fewer than 23 of Defendants' Phantom games are running the identical Reel Strips of Plaintiffs' StealthX games and misappropriating Plaintiffs' trade secrets:

| **Plaintiffs' Game Running StealthX** | **Defendants' Game Running Phantom** |
|---|---|
| Armadillo Shootout | Pirate Treasure |
| China Street | China Street |
| Country Lights | Country Lights |
| Ducky Shamrock | Steampunk |
| Ducky Shamrock | Shamrockin Rollers |
| Forest Wild | Forest Wild |
| Glacier Gold | Glacier Gold |
| Glacier Gold | Buffalo Dynamite |
| Glacier Gold | Gold Rush Dynamite |
| Lone Star | Lucky Panda |
| Lone Star | Sirens |
| Lucky Cat | Fortune Cat |
| Lucky Cat | Golden Turtle |
| Lucky Cat Gold | Tiki Boom |
| Lucky Star | Blazing 7s |
| Olvera Street | Olvera Street |
| Olvera Street | Living Largo |

| | |
|---|---|
| Olvera Street | Reel Texan |
| Pirate Squid Attack | Diabla |
| River Walk | River Walk |
| Route 66 | Route 66 |
| Sin City | High Roller |
| Sin City | Oasis Gold |

67. Defendants' Phantom games using Plaintiffs' StealthX's Software, Reel Strips and Math Models are found online and in numerous brick and mortar venues across the State of Texas in more than 100 locations.

68. Accordingly, Operator Defendants, Defendant Joseph, and Defendant Rogers committed misappropriation under DTSA, 18 U.S.C. § 1836(b).

69. Plaintiff THC and Licensing Plaintiffs are entitled to enhanced damages up to twice the amount of the compensatory award due to Operator Defendants' and Defendants Joseph's and Rogers' willful and malicious misappropriation.

70. Plaintiff THC and Licensing Plaintiffs are entitled to attorneys' fees due to Operator Defendants' and Defendants Joseph's and Rogers' willful and malicious misappropriation.

71. As a result of Operator Defendants' and Defendants Joseph's and Rogers' misappropriation of Plaintiff THC and Licensing Plaintiffs' Software, Reel Strips and Math Models, Plaintiffs are also entitled to injunctive relief prohibiting Operator Defendants and Defendants Joseph and Rogers from further misappropriating Plaintiffs' trade secrets.

**COUNT 2**
**MISAPPROPRIATION OF TRADE SECRETS UNDER TEXAS UNIFORM SECRETS ACT**
**(All Defendants)**

72. Plaintiffs incorporate the previous paragraphs of this Complaint by reference and realleges them as originally and full set forth here.

73. To show misappropriation of trade secrets under the TUTSA, a plaintiff must prove: (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) defendant used the trade secret without authorization from the plaintiff. TEX. CIV. PRAC. & REM. CODE §§ 134A.002, 134A.003–.004; *CAE Integrated, LLC v. Moov Technologies, Inc.*, 44 F.4th 257, 262 (5th Cir. 2022).

74. As discussed above, Plaintiff THC owns trade secret sweepstakes Software. Plaintiffs' StealthX games run on Plaintiffs' proprietary and trade secret Software, which includes the highly confidential and closely held Reel Strips and mathematical algorithm that runs its sweepstakes games. The Math Models determine the order of symbols on a reel strip, the reel stops for each play of the game, and the distribution of prizes. Plaintiffs' Reel Strips and Math Models are unique and not known to anyone outside of a handful of Plaintiffs' key employees. Plaintiff THC licenses its Software to Licensing Plaintiffs.

75. As discussed above, Plaintiffs safeguard Software, Reel Strips and Math Models since those are the most important part of the Games. Only employees that work in the Dallas, Texas office have access to the direct code to keep direct access to a bare minimum and need to know. Plaintiffs obfuscate their code and a software

bundle does not leave the Dallas office without being obfuscated. The StealthX software also has built in authorization protocols too to protect the software from unauthorized access.

76. Plaintiffs license their software to distributors, but at all time Plaintiffs retain ownership of their software. Plaintiffs licensed its software to Defendants for distribution in Texas.

77. As disclosed in the ESLA shown above, the Defendants were fully aware that the Software belonged to Plaintiffs, "[t]he Software supplied by MIDWAY pursuant to this Agreement shall at all times remain the sole and exclusive property of MIDWAY, notwithstanding that it may hereafter be installed on Equipment furnished by the OPERATOR."

78. Defendants were also put on notice in the ESLA that they must protect Plaintiffs' trade secrets and confidential information,

> *The Parties agree that they will use such Confidential Information of the other Party solely in connection with their respective obligations hereunder and shall maintain in strictest confidence and shall not use or disclose any such Confidential Information, except in furtherance of the Party's duties hereunder, directly or indirectly or use such Confidential Information of the other Party in any other way during the term of this Agreement or for five years following the expiration or termination of this Agreement. The Parties further agree to take all reasonable steps necessary to preserve and protect the Confidential Information of the other Party.*

79. Despite knowing Plaintiffs' Software, Reel Strips and Math Models were trade secrets and confidential information and highly protected, Defendants Joseph

and Rogers put a plan in place to misappropriate them for their use and Operator Defendants' use and executed on that plan.

80. As detailed above, Operator Defendants are using Plaintiffs' Math Models, including the highly coveted Reel Strips. Defendants took the Math Models and Reel Strips from Plaintiffs' StealthX Software and are using it in their Phantom games without authorization from Plaintiffs.

81. No fewer than 23 of Defendants' Phantom games are running the identical Reel Strips of Plaintiffs' StealthX Games and misappropriating Plaintiffs' trade secrets:

| **Plaintiffs' Game Running StealthX** | **Defendants' Game Running Phantom** |
|---|---|
| Armadillo Shootout | Pirate Treasure |
| China Street | China Street |
| Country Lights | Country Lights |
| Ducky Shamrock | Steampunk |
| Ducky Shamrock | Shamrockin Rollers |
| Forest Wild | Forest Wild |
| Glacier Gold | Glacier Gold |
| Glacier Gold | Buffalo Dynamite |
| Glacier Gold | Gold Rush Dynamite |
| Lone Star | Lucky Panda |
| Lone Star | Sirens |
| Lucky Cat | Fortune Cat |
| Lucky Cat | Golden Turtle |
| Lucky Cat Gold | Tiki Boom |
| Lucky Star | Blazing 7s |
| Olvera Street | Olvera Street |
| Olvera Street | Living Largo |
| Olvera Street | Reel Texan |
| Pirate Squid Attack | Diabla |
| River Walk | River Walk |
| Route 66 | Route 66 |
| Sin City | High Roller |
| Sin City | Oasis Gold |

82. Defendants' Phantom games using Plaintiffs' StealthX's Software, Reel Strips and Math Models are found online and in numerous brick and mortar venues across the State of Texas.

83. Accordingly, Operator Defendants and Defendant Joseph and Defendant Rogers have misappropriated Plaintiffs' trade secrets under TUTSA. This violation is malicious and willful.

84. As a result of Operator Defendants' and Defendants Joseph's and Rogers' unlawful actions, Plaintiffs are entitled to actual damages. Plaintiffs are also entitled to costs.

85. Because Operator Defendants' and Defendants Joseph's and Rogers' misappropriation is willful and malicious, Plaintiffs are entitled to its reasonable attorneys' fees.

**COUNT 3**
**BREACH OF CONTRACT**
**(Operator Defendants)**

86. Licensing Plaintiffs incorporate the previous paragraphs of this Complaint by reference and realleges them as originally and full set forth here.

87. To show breach of contract, plaintiff must prove: (1) a valid and enforceable contract existed; (2) plaintiff performed; (3) defendant breached the contract; and (4) the breach caused harm.

88. Operator Defendants and Licensing Plaintiffs entered into the ELSA on or about April 28, 2018. Licensing Plaintiffs performed their duties and obligations under the contract. On April 28, 2026, Operator Defendants terminated the contract.

89. The ELSA provides, among other things, that Operator Defendants must protect Plaintiffs' trade secrets and confidential information *during the term of this Agreement or for five years following the expiration or termination of this Agreement:*

> 17. <u>Protection of Trade Secrets and Confidential Information</u>. The Parties acknowledge and agree that through the performance of this Agreement each Party may have access to various trade secrets and confidential business information of the other Party or the other Party's affiliates (including subsidiaries, parents, and their respective affiliates), business associates, officers, directors, and/or employees (collectively, "Confidential Information"). *The Parties agree that they will use such Confidential Information of the other Party solely in connection with their respective obligations hereunder and shall maintain in strictest confidence and shall not use or disclose any such Confidential Information, except in furtherance of the Party's duties hereunder, directly or indirectly or use such Confidential Information of the other Party in any other way during the term of this Agreement or for five years following the expiration or termination of this Agreement. The Parties further agree to take all reasonable steps necessary to preserve and protect the Confidential Information of the other Party*. The provisions of this Section shall not apply to information which (i) is or becomes generally available to the public other than as a result of a disclosure by a Party, its affiliates, employees, agents, or advisors in violation of this Agreement, or (ii) becomes available to a Party from a third party having the right to make such disclosure. Upon any termination of this Agreement, each Party will promptly return to the other Party all data, materials, and other property, including Confidential Information that has been reduced to tangible form, of the other Party.

90. Operator Defendants breached the ESLA by using Plaintiffs' Math Models, including the highly coveted Reel Strips, outside of the parameters of the ESLA. Defendants took the Math Models and Reel Strips from Plaintiffs' StealthX Software and are using it in their Phantom games without authorization from Plaintiffs. No fewer than 23 of Defendants' Phantom games are running the identical

Reel Strips of Plaintiffs' StealthX games and misappropriating Plaintiffs' trade secrets.

91. Licensing Plaintiffs have been financially harmed by Operator Defendants breach.

92. Licensing Plaintiffs seek monetary damages for Operator Defendants' breach.

93. Licensing Plaintiffs seek an injunctive relief provided for by the ESLA:

> 18. Injunctive Relief. *OPERATOR acknowledges and agrees that it would be difficult to fully compensate MIDWAY for damages resulting from the breach or threatened breach of the covenants of this Agreement, and that any such breach would cause MIDWAY irreparable harm. Accordingly, MIDWAY will be entitled to seek injunctive relief, including but not limited to temporary restraining orders, preliminary injunctions and permanent injunctions, to enforce the terms thereof, without the need to demonstrate irreparable harm*. This right to injunctive relief will not, however, diminish any of MIDWAY's other legal rights under this Agreement or applicable law. Venue and jurisdiction for any injunctive relief under this paragraph shall lie in federal or state court located in Travis County, Texas, and shall not be governed or limited by the arbitration clause above, to the extent necessary to secure injunctive relief.

## VI. PRAYER FOR RELIEF

Plaintiffs respectfully request this Court to summon each Defendant to appear and answer this Complaint, and after being heard on the merits, grant judgment in favor of Plaintiffs as follows as:

(a) Find each Defendant liable for violations of the DTSA, 18 U.S.C. § 1836(b);

(b) Find each Defendant liable for violations of the TUTSA, TEX. CIV. PRAC. & REM. CODE §§ 134A.002, 134A.003–.004;

(c) Find Defendants' violations of both the DTSA and TUTSA were willful and malicious;

(d) Find Operator Defendants liable for breach of contract;

(e) Enter a preliminary and permanent injunction prohibiting all Defendants, and their agents, servants, and employees, and all persons or entities acting in concert with or for them, from continuing to reproduce, distribute, display, disseminate, transmit, make available for download, or otherwise use Plaintiffs THC's Software, Reel Strips and/or Math Models in any manner whatsoever;

(f) Order Defendants and their agents, servants, and employees, and all persons or entities acting in concert with or for them, to destroy all copies of Plaintiff THC's and Licensee Plaintiff's Software, Reel Strips and Math Models that Defendants have used and/or downloaded onto any computer hard drive or server without authorization and to destroy copies of that downloaded software transferred onto any physical medium or device in Defendant's' possession, custody, or control;

(g) Order Defendants and their agents, servants, and employees, and all persons or entities acting in concert with or for them, to destroy all copies of Defendants' Phantom software;

(h) Award Plaintiff THC and Licensee Plaintiffs their actual damages and all Operator Defendants' additional profits in an amount to be determined at trial;

(i) Award Plaintiff THC and Licensee Plaintiffs statutory and other damages as provided under the DTSA and TUTSA;

(j) Order an accounting of the use and/or download by Operator Defendants of Plaintiff THC and Licensee Plaintiffs' Software;

(k) Order an accounting of any revenues or profits realized by or through Operator Defendants' use and/or download of Plaintiff THC and Licensee Plaintiffs" Software;

(l) Award Plaintiff THC and Licensee Plaintiffs prejudgment and post judgment interest;

(m) Award Plaintiff THC and Licensee Plaintiffs' costs, attorneys' fees, and expenses arising from this suit; and

(n) Grant Plaintiff THC and Licensee Plaintiffs such other relief as this Court deems just and proper.

## VII. JURY DEMAND

In accordance with FED. R. CIV. P. 38 and 39, Plaintiff THC and Licensee Plaintiffs asserts their rights under the Seventh Amendment to the United States Constitution and demands a trial by jury on all issues that may be so tried.

Dated: October 20, 2026

Respectfully submitted,

DANIELS & TREDENNICK PLLC

*<u>/s/ John F. Luman III</u>*
John F. Luman III
Texas State Bar No. 00794199
Heath A. Novosad
Texas State Bar No. 24037199

DANIELS & TREDENNICK PLLC
6363 Woodway, Suite 700
Houston, Texas 77057
(713) 917-0024 – Telephone
(713) 917-0026 – Facsimile
luman@dtlawyers.com
heath.novosad@dtlawyers.com

**COUNSEL FOR PLAINTIFFS TECHNOLOGY HOLDINGS CORPORATION, INC., MIDWAY SOFTWARE SYSTEMS, LLC, MUSTANG SOFTWARE, LLC, AND 239 SOFTWARE, LLC**