# EXHIBIT 1

# EXCLUSIVE SOFTWARE LICENSE AGREEMENT

This Exclusive Software License Agreement (hereinafter referred to as "Agreement") is entered into effective as of this 28th day of April, 2018, by and between Midway Software Systems, LLC, a Delaware limited liability company (hereinafter referred to as "MIDWAY") and Southwest Sweepstakes, LLC, a Texas Limited Liability Company (hereinafter referred to as "OPERATOR") (MIDWAY and OPERATOR are each a "Party"; collectively, the "Parties").

Whereas MIDWAY is a manufacturer of proprietary Sweepstakes Revealer Terminals ("SRTs"), and sweepstakes and amusement software ("Software"), including but not limited to game terminals, SRT-related servers, and point of sale (POS) terminals (SRTs, Software, and other equipment hereinafter collectively referred to as "Equipment and Software") and;

Whereas OPERATOR contracts to provide electronic sweepstakes to business establishments within the State of Texas ("OPERATOR'S Customers").

**IT IS MUTUALLY AGREED AS FOLLOWS:**

1. Equipment and Software/Exclusivity. MIDWAY shall supply to OPERATOR the Equipment and Software that is to be placed on location at OPERATORS OR OPERATOR'S Customers' locations within the state of Texas. MIDWAY shall also supply the server as part of the Equipment and Software, but the server may be remote or local. MIDWAY shall be OPERATOR's exclusive provider of SRTs and Software, except as specifically authorized by MIDWAY. Except as set forth below, OPERATOR shall not purchase, license and/or utilize SRTs, Software or similar offerings from any vendor other than MIDWAY without MIDWAY's advance written consent which shall not be unreasonably withheld, denied, delayed, or conditioned. For OPERATOR'S Customers' locations that already have sweepstakes software located on the premises and for which OPERATOR provides notice in writing to MIDWAY ("Co-Location Properties"), OPERATOR shall be entitled to place the Equipment and Software alongside the existing sweepstakes machines,and shall not be obligated to remove any existing sweepstakes machines unless both MIDWAY and OPERATOR both agree that if a discount is given to the location to acquire the business then all other sweepstakes systems shall be removed. .

   OPERATOR shall be the exclusive provider of the Equipment and Software within the State of Texas. During the term (either original or as extended) of this Agreement, MIDWAY shall not provide the Equipment and Software to any other person or entity for its distribution or use within the State of Texas and will not contract with or suffer or allow any other person or entity to distribute or use the Equipment and Software within the State of Texas. If MIDWAY determines to bring other equipment or software to market for use in electronic sweepstakes in Texas, MIDWAY and OPERATOR will amend or supplement this Agreement to cover such additional equipment or software so that OPERATOR remains the exclusive Texas distributor of MIDWAY's equipment and software for electronic sweepstakes.

2. Equipment. MIDWAY will supply and OPERATOR will install the necessary Equipment and Software to operate as many as (250) SRTs and the necessary management/point of sale equipment to operate the SRTs at OPERATORS' or OPERATORS Customers' location(s). After MIDWAY has supplied (250) SRT's, MIDWAY will continue to provide Software and may at its discretion, continue to supply SRT's or decide not to supply further SRT's. If, after MIDWAY has provided 250 SRTs, OPERATOR desires to have MIDWAY provide more SRTs for OPERATOR'S Customers' locations and MIDWAY decides not to supply additional SRTs, OPERATOR may supply its own equipment. If

OPERATOR supplies its own equipment, MIDWAY must approve and sign off on the equipment that is supplied by OPERATOR to ensure that any software provided by MIDWAY is compatible and can run on such equipment.

3. <u>Title to Software</u>. The Software supplied by MIDWAY pursuant to this Agreement shall at all times remain the sole and exclusive property of MIDWAY, notwithstanding that it may hereafter be installed on Equipment furnished by the OPERATOR. As such, the Software is not subject to ownership or encumbrances by the OPERATOR or OPERATOR's customers or any other person or entity. All Equipment and/or any other material furnished by MIDWAY shall be returned to MIDWAY at the termination of this Agreement in the same condition in which it was delivered, excepting reasonable wear and tear. OPERATOR is strictly prohibited from retaining all or any portion of the Software after the termination of this Agreement, including any copies of any portion of the Software, including but not limited to its source code, methods of operation, algorithms and artwork.

4. <u>Service and Updates</u>. OPERATOR hereby agrees that representatives of MIDWAY are authorized to enter the locations at any reasonable time to service the Equipment and Software so as to maintain it in operating condition at all times, and to make any necessary modifications or updates to the Equipment and Software. In addition, OPERATOR and OPERATOR's Customers hereby agree to assure that anySRT-related server(s) on location at OPERATOR's or OPERATOR'S Customers' locations will be connected to the Internet at all times so that MIDWAY may monitor the activity on same, and MIDWAY may access the SRT-relatedserver(s) via the Internet to perform necessary modifications or updates as necessary in accordance with guidelines established by MIDWAY.

5. <u>Operator and OPERATOR'S Customers' Responsibilities</u>. Once Equipment and Software is installed at a location, the OPERATOR and OPERATOR'S Customers shall be responsible for: (a) keeping the location clean, (b) maintaining appropriate surveillance and security with respect to the Equipment and Software, (c) paying for all required terminal license fees, bonding, utility charges, rents, advertising, player comps, taxes, fees, licenses, and costs incurred related to the location and Equipment and Software at the location, (d) any required governmental filing relating to the facility or the Sweepstakes Promotions, (e) any charitable relationship or other arrangement necessary to comply with state law, (f) supplying adequate technical staff to provide day to day operational maintenance and support of the Equipment and Software and solutions provided, (g) adequate electrical power and DSL/cable service, (h) network cabling, (i) cabinets/workstations and chairs for the player stations and (j) adequate, secure, and accessible space, including shelf or tabletop for the server to be stored and maintained.

6. <u>Commencement and Termination of Agreement</u>. MIDWAY will supply and OPERATOR will install the Equipment and Software at a date mutually agreed upon. The term of this Agreement shall commence on the date hereof and continue until the two (2) year anniversary date on which such Equipment and Software are first available to OPERATOR'S Customers. Thereafter, this Agreement shall renew automatically on an annual basis. Each Party shall have the right, beginning in the 21st month of this Agreement, to terminate this Agreement prior to renewal by delivering notice of such non-renewal at least ninety (90) days prior to the anniversary/renewal date. Upon termination of this Agreement, (i) MIDWAY will promptly remove its Equipment and Software from the locations, and (ii) any and all monies due to MIDWAY shall be paid within seven days of such termination. In the event that OPERATOR terminates this Agreement or uses another vendor's software at any location where Equipment purchased from MIDWAY is installed (except as to Co-Location Properties), prior to the end of the initial term of this Agreement, then OPERATOR agrees to pay MIDWAY, as liquidated damages, and not as a penalty of forfeiture, a sum equal to the average weekly amount received by

MIDWAY prior to the termination, multiplied by the number of weeks remaining in the unexpired term of this Agreement, which sum shall be immediately due and payable upon the termination of this Agreement. In addition, OPERATOR shall reimburse MIDWAY all legal fees and cost incurred by MIDWAY to obtain any remedy for breach of this agreement.

7. Revenue Share Fee. OPERATOR (or its charity affiliate as may be required under state law, hereinafter "Charity Affiliate") shall collect 100% of the Net Revenue, as defined below, from the Equipment and Software. Five percent (5%) of the Net Revenue shall be provided to the Charity Affiliate as a Charitable Contribution. Except as otherwise agreed by OPERATOR and MIDWAY as to any particular location, OPERATOR or its Charity Affiliate will pay to MIDWAY an amount equal to 25% of the "Net Net Revenue" ("Net Net Revenue" being defined as Net Revenue minus the 5% Charitable Contribution) per day per Equipment device installed, if MIDWAY provides the Equipment, and 20% per day if OPERATOR provides the Equipment (hereinafter referred to as the "Revenue Share Fee"). OPERATOR or its Charity Affiliate will pay the Revenue Share Fee to MIDWAY on a weekly basis as further described below, or such intervals as the parties may otherwise agree. Here is the example 1000 net at the Location. 1000.00 (net revenue) minus (5%) or 50.00= 950 net. Location gets 475 if it's a 50/50 split we get 475. Split 50/50 with Morris and us. 237.50 each
1000 gross net

a. Net Revenue: "Net Revenue" is defined as the total revenue generated by the sale of products or donation contributions to which sweepstakes chances are attached minus any prizes paid out to the winners. Further, Net Revenue specifically includes and there shall be no deduction for any promotional comps given to customers by OPERATOR unless prior written approval is given by MIDWAY.

b. Set Off: Revenue Share Fee due to MIDWAY shall not be subject to any set-off as defined herein.

c. Revenue Share Fee Payment Due Dates: Revenue Share Fee payments to MIDWAY shall be calculated and paid based upon a weekly period that begins on each Monday after installation and ends on the following Sunday. Net Revenue for each week shall be compiled and calculated by the following Monday, and the Revenue Share Fee shall be paid by wire transfer or other means to assure payment is received by MIDWAY by Thursday of the same week (hereinafter referred to as the "Due Date").

d. Place of Payments: OPERATOR or its Charity Affiliate shall remit Revenue Share Fee payments to MIDWAY as designated in writing by MIDWAY.

e. Taxes and Fees: OPERATOR or its Charity Affiliate shall be responsible for any sales or use taxes, bonding and terminal license fees imposed, if any, for the Equipment devices located on OPERATOR's or OPERATOR'S Customers' premises.

f. Late Fees: Revenue Share Fee payments to MIDWAY shall be deemed late if received more than two (2) days after the related due date and shall bear an administrative late fee of .75% of the late Revenue Share Fee per each two-week delay, calculated from the due date.

g. ACH Agreement: OPERATOR or its Charity Affiliate must enter into an Authorization Agreement for Automated Clearing House (ACH) which MIDWAY will initiate to deduct payments from OPERATOR's bank account due under this section if

OPERATOR is delinquent on payments.

h. Non-Payment: OPERATOR expressly acknowledges that non-payment or repeated late payment of amounts due MIDWAY may result in the removal of or disabling of Equipment or Software in the possession of OPERATOR, any of OPERATOR'S Customers, and/or OPERATOR'S Charity Affiliate.

8. Restrictions. OPERATOR shall not sell, rent, lease, sublicense, transfer, distribute, provide access to, or otherwise make available, the Software or any copies thereof, to any third party. In addition, OPERATOR shall not translate, reverse engineer, copy, decompile, or disassemble the Software. The OPERATOR shall not independently develop or contract for the development of software which is substantially similar to the Software in functionality or appearance.

9. Policing. OPERATOR agrees to notify MIDWAY immediately upon receipt of information related to any third-party infringement of intellectual property or conversion or theft of servers related to the Software ("Third Party Infringement"). OPERATOR further agrees to cooperate with any enforcement efforts of MIDWAY or its affiliates for Third Party Infringement, at the cost of MIDWAY for any attorney's fees and out-of-pocket expenses incurred, including but not limited to: (i) execution and deliverance of any requested affidavits, (ii) providing testimony in connection with any proceeding, and/or (iii) any other acts reasonably deemed necessary or desirable to carry out the purposes of this Agreement.

10. Indemnification. OPERATOR agrees to indemnify, defend and hold MIDWAY and its officers and directors harmless from and against any claims, liability or damage for injury or loss, including reasonable attorneys' fees, arising out of the use and possession of the Equipment and supporting equipment, including but not limited to any claims (including forfeiture claims) arising under federal, state or local law. In the event of an indemnifiable claim, MIDWAY shall be entitled to select legal counsel to defend MIDWAY, subject to the approval of OPERATOR (which approval shall not be unreasonably withheld).

11. Notices. All notices required or authorized under this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, to the following addresses:

| | |
|---|---|
| MIDWAY Systems, LLC: | ______________________ |
| Attn: Administration | Attn: |
| ______________________ | ______________________ |
| ______________________ | ______________________ |

Notices shall be deemed given on the date delivered if delivered by hand delivery, otherwise on the second day after mailing as described above.

12. Termination and Default Remedies. Any one or more of the following shall constitute an "Event of Default" hereunder: (a) OPERATOR failing to take action to prevent any unauthorized assignment or transfer of the Equipment from a location; (b) default in the observance or performance of any covenant, condition, agreement, warranty or provision hereof by either Party and such default shall continue for more than (14) days after written notice thereof; (c) any Party's insolvency or bankruptcy; (d) the cessation of operations at any location, for any reason other than acts of God, for more than 21 days; should this occur, OPERATOR shall have 30 days to relocate the Equipment to another location and resume operations, but if this does not occur, MIDWAY shall have the right to terminate; and (e) Non-Payment. When any Event of Default has occurred, the non-

defaulting party may proceed by appropriate dispute resolution as provided in Section 15 below; and/or terminate this Agreement, and recover any damages resulting from such default, after (15) days written notice to the defaulting Party.

13. Compliance. The Parties acknowledge that OPERATOR and MIDWAY and its suppliers will use its best efforts to comply with all laws and regulations affecting the business activities of the Parties and must not have any background or historical issues or associations which may bring disrepute to the business relationship and the conduct of their respective businesses. OPERATOR acknowledges and agrees that MIDWAY or their respective affiliates are solely providing the Equipment and Software and it is the sole responsibility of OPERATOR to ensure that use of the Equipment and/or Software is lawful in the jurisdiction(s) in which OPERATOR conducts business. MIDWAY MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE LEGALITY OF OPERATIONS IN USING THE EQUIPMENT OR SOFTWARE IN OPERATOR'S JURISDICTION(S). OPERATOR agrees that it is solely responsible for compliance with all federal, state, or local laws, ordinances, regulations or legal actions related to its business. To the extent that OPERATOR must contract with third parties to this contract in order to comply with state or local law, including but not limited to a Charity Affiliate as defined in Section 5, OPERATOR agrees and hereby assumes complete responsibility and control for such relationship in its formation and execution. OPERATOR further agrees to ensure that any such third party, including any Charity Affiliate, complies with the payment obligations and payment structure set forth in Section 7 of this Agreement.

a. This Agreement is contingent that OPERATOR shall promptly apply for, diligently pursue and maintain all licenses, permits, and regulatory approvals as may be required of it for the lawful operation of the locations and the conduct of its businesses. Further, OPERATOR shall at all times abide by the laws, regulations, rules, and requirements of governmental authorities applicable to it and its operations.

b. If any material license or approval necessary for either Party to perform under this Agreement is denied, suspended, or revoked, the other party may suspend or terminate this Agreement in whole or in part, pursuant to written notice within (20) days of its notification of the adverse action. The Parties may by mutual agreement continue to perform under this Agreement to the extent it is unaffected by the denial, suspension, or revocation.

c. OPERATOR and MIDWAY acknowledge that, to the best of their knowledge, the subject matter of this Agreement does not violate any existing laws applicable to either party or their respective operations. If it is later determined by either Party that the subject matter of this Agreement violates a then-existing law or regulation, either Party may terminate this Agreement by providing written notice thereof.

d. In the event that OPERATOR fails to comply with all compliance requirements set forth herein, MIDWAY, in its sole discretion, may terminate this Agreement without further liability, with (30) days' notice, or sooner if necessary.

e. In the event that MIDWAY believes in good faith that a change or subsequent interpretation of the law in any jurisdiction in which OPERATOR conducts business renders the Equipment and/or Software, or MIDWAY and/or its affiliates, subject to civil or criminal action, MIDWAY will provide written notice of such good faith belief to OPERATOR and OPERATOR shall have 30 days to provide MIDWAY with reasonable further assurance regarding the sweepstakes, the Equipment, the Software, and/or the potential liability of MIDWAY and/or its affiliates. If OPERATOR's further assurance is unacceptable to MIDWAY, MIDWAY, in its reasonable business judgment, may terminate this Agreement on (30) days' notice and payment to OPERATOR of OPERATOR's out of

pocket costs for purchase and installation of any OPERATOR-owned equipment OPERATOR has placed relating to this Agreement.

14. Modification, Rescission, Assignment. This Agreement may be modified, rescinded, and assigned only with the written consent of both parties hereto. However, MIDWAY will have the right to transfer, assign or mortgage its interests, joint or severally without consent of OPERATOR, provided that OPERATOR be notified of such assignment in writing. Accordingly, OPERATOR and MIDWAY will sign a Notice, Consent and Acknowledgment of Assignment or Sale, furnished by MIDWAY. OPERATOR shall make payments to Assignee when due, shall not modify the existing Transaction and shall not attempt to terminate the Transaction on account of any assignment by MIDWAY.

15. Dispute Resolution. Other than matters which may arise pursuant to Paragraph 13 (Compliance) or for injunctive relief as specified in Paragraph 18, the Parties will attempt to resolve any disputes relating to the Agreement through amicable negotiations. Failing an amicable settlement, however, any controversy, claim or dispute arising under or relating to this Agreement, including the existence, validity, interpretation, performance, termination or breach of this Agreement, will finally be settled by binding arbitration before a single arbitrator (the "Arbitration Tribunal") which will be jointly appointed by the Parties. The Arbitration Tribunal shall self-administer the arbitration proceedings utilizing the Commercial Rules of the American Arbitration Association ("Association"); provided, however, the Association shall not be involved in administration of the arbitration. The arbitrator must be a retired judge of a state or federal court of the United States or a licensed lawyer with at least ten years of securities or commercial law experience. If the Parties cannot agree on an arbitrator within (10) days, they shall each select one so qualified arbitrator and the two arbitrators so selected shall mutually select a third arbitrator whose appointment will be final. The arbitration will be held in Travis County, Texas. Each Party will have discovery rights as provided by the Texas Rules of Civil Procedure within the limits imposed by the arbitrator; provided, however, that all such discovery will be commenced and concluded within (60) days of the selection of the arbitrator. It is the intent of the Parties that any arbitration will be concluded as quickly as reasonably practicable. The arbitrator will use all reasonable efforts to issue the final written report containing award or awards within a period of five business days after closure of the proceedings. Failure of the arbitrator to meet such time limits will not be a basis for challenging the award. The Arbitration Tribunal will not have the authority to award punitive damages to either Party. Each party will bear its own expenses, but the Parties will share equally the expenses of the Arbitration Tribunal. The Arbitration Tribunal may award attorney's fees and other related costs payable by the losing Party to the successful Party as it deems equitable. This Agreement will be enforceable, and any arbitration award will be final and non-appealable, and judgment thereon may be entered in any court of competent jurisdiction. Notwithstanding the foregoing, claims for injunctive relief may be brought in a state or federal court located in Travis County, Texas.

16. Access. OPERATOR agrees that continuing access to the OPERATOR'S or OPERATOR'S Customers' facilities (i.e., the locations) is hereby granted to MIDWAY, its agents, employees, and representatives to the extent necessary to perform its obligations and exercise its rights hereunder.

17. Protection of Trade Secrets and Confidential Information. The Parties acknowledge and agree that through the performance of this Agreement each Party may have access to various trade secrets and confidential business information of the other Party or the other Party's affiliates (including subsidiaries, parents, and their respective affiliates), business associates, officers, directors, and/or employees (collectively, "Confidential Information"). The Parties agree that they will use such Confidential Information of the other Party solely in connection with their respective obligations hereunder and shall maintain in strictest confidence and shall not use or disclose any such Confidential Information,

except in furtherance of the Party's duties hereunder, directly or indirectly or use such Confidential Information of the other Party in any other way during the term of this Agreement or for five years following the expiration or termination of this Agreement. The Parties further agree to take all reasonable steps necessary to preserve and protect the Confidential Information of the other Party. The provisions of this Section shall not apply to information which (i) is or becomes generally available to the public other than as a result of a disclosure by a Party, its affiliates, employees, agents, or advisors in violation of this Agreement, or (ii) becomes available to a Party from a third party having the right to make such disclosure. Upon any termination of this Agreement, each Party will promptly return to the other Party all data, materials, and other property, including Confidential Information that has been reduced to tangible form, of the other Party.

18. Injunctive Relief. OPERATOR acknowledges and agrees that it would be difficult to fully compensate MIDWAY for damages resulting from the breach or threatened breach of the covenants of this Agreement, and that any such breach would cause MIDWAY irreparable harm. Accordingly, MIDWAY will be entitled to seek injunctive relief, including but not limited to temporary restraining orders, preliminary injunctions and permanent injunctions, to enforce the terms thereof, without the need to demonstrate irreparable harm. This right to injunctive relief will not, however, diminish any of MIDWAY's other legal rights under this Agreement or applicable law. Venue and jurisdiction for any injunctive relief under this paragraph shall lie in federal or state court located in Travis County, Texas, and shall not be governed or limited by the arbitration clause above, to the extent necessary to secure injunctive relief.

19. Limitation of Liability. MIDWAY will be responsible for the acts and omissions of its own employees, or any defective Equipment up to the amount of Revenue Share Fees received by or payable to MIDWAY hereunder. MIDWAY shall not be liable for direct, indirect, incidental, or consequential damages, including but not limited to loss of use, revenue, or prospective profits resulting from the operation or malfunction of Equipment.

20. Insurance. OPERATOR agrees to provide adequate property insurance and liability insurance to protect the interests of both Parties as it relates to this Agreement, including Equipment provided by MIDWAY, with MIDWAY (and any additional designees) named as additional insured. The amount of insurance shall include costs of server and other supporting equipment provided and owned by MIDWAY. MIDWAY shall not be liable for any such costs. In the event of any damage to any Equipment, or any disaster affecting the locations, OPERATOR shall report it without delay to MIDWAY. OPERATOR will provide MIDWAY proof of insurance upon request. If the OPERATOR does not provide evidence of adequate insurance coverage, MIDWAY may at its sole discretion obtain insurance for Equipment and bill OPERATOR the cost of such insurance.

21. Waiver. No Party shall be considered to have waived any rights under this Agreement, even if such Party does not insist upon the strict performance of any promise, duty, or condition of this Agreement. No waiver will be binding unless signed in writing by the Party making the waiver.

22. Entire Agreement. This Agreement contains the entire and only agreement between the Parties hereto with respect to the subject matter hereof.

23. Relationship. This Agreement does not create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between the Parties hereto.

24. Partial Invalidity. If any provision of this Agreement shall be deemed invalid or unenforceable to any extent, the remainder of this Agreement and application thereof shall not be affected thereby and shall remain enforceable to the greatest extent

permitted by law.

25. Authority. Each Party hereby represents and warrants to the other that such party is authorized to execute and deliver this Agreement and that it is duly authorized to enter into this Agreement. MIDWAY and OPERATOR signatures, along with full names and titles appear below.

26. Representations and Warranties of OPERATOR. OPERATOR hereby represents and warrants to MIDWAY that OPERATOR'S execution, delivery, and performance of this Agreement will not (i) result in a breach of any of the terms or conditions of, or constitute a default under, any mortgage, note, bond, indenture, agreement, license or other instrument or obligation (including OPERATOR's articles or certificate of incorporation and bylaws) to which OPERATOR is now a party or by which it or any of its respective properties or assets may be bound or affected, or (ii) violate any order, writ, injunction, or decree of any court, administrative agency, or governmental body in any respect, the violation or breach of which would prevent the OPERATOR from consummating the transactions contemplated herein. Furthermore, OPERATOR represents and warrants to MIDWAY that this Agreement is a valid and binding agreement of OPERATOR, enforceable against it in accordance with its terms.

27. Representations and Warranties of MIDWAY. MIDWAY hereby represents and warrants to OPERATOR that MIDWAY's execution, delivery, and performance of this Agreement will not (i) result in a breach of any of the terms or conditions of, or constitute a default under, any mortgage, note, bond, indenture, agreement, license or other instrument or obligation (including MIDWAY's articles or certificate of incorporation and bylaws) to which MIDWAY is now a party or by which it or any of its respective properties or assets may be bound or affected, or (ii) violate any order, writ, injunction, or decree of any court, administrative agency, or governmental body in any respect, the violation or breach of which would prevent MIDWAY from consummating the transactions contemplated herein. Furthermore, MIDWAY represents and warrants to OPERATOR that this Agreement is a valid and binding agreement of MIDWAY, enforceable against it in accordance with its terms.

**BY SIGNING BELOW, THE PARTIES AGREE AND RATIFY THAT THEY HAVE READ AND UNDERSTAND THE ABOVE AND WISH TO ENTER INTO THIS EXCLUSIVE SOFTWARE LICENSE AGREEMENT.**

| **MIDWAY SOFTWARE SYSTEMS, LLC** | **OPERATOR** |
|---|---|
| | **SOUTHWEST SWEEPSTAKES, LLC** |
| ______________________ | [signature] |
| Signature | Signature |
| ______________________ | Owner |
| Title | Title |
| ______________________ | 8/1/18 |
| Date | Date |

**AMENDMENT ONE**
**TO**
**EXCLUSIVE SOFTWARE LICENSE AGREEMENT**

WHEREAS, Midway Software Systems, LLC (“MIDWAY”) and Southwest Sweepstakes, LLC (“OPERATOR”) entered into an Exclusive Software License Agreement (“Agreement”) ON April 28, 2018, and

WHEREAS, the initial Agreement has expired and both parties wish to continue the Agreement;

THEREFORE, the parties agree as follows:

1. Amendment One will be between Midway Software Systems, LLC (“MIDWAY”), Mustang Software, LLC (“MUSTANG”) and Mojo Consultants, Inc. (“OPERATOR”).
2. Term of Amendment One will be for five (5) years.
3. OPERATOR will install a minimum of one hundred fifty SRTs during each of the five (5) years, for a total of seven hundred fifty SRTs as the end of the five (5) year extension.
4. OPERATOR will pay twenty-five (25) percent of Net Revenue as defined in Section 7a of Agreement derived from within the OPERATOR’s Customers’ locations. This will start with the billing cycle for week ending May 9, 2021.
5. OPERATOR will pay twenty (20) percent of Net Revenue as defined in Section 7a of Agreement derived from outside of the OPERATOR’s Customers’ locations.

All other parts of the Agreement remain unchanged.

This Amendment One shall take effect on this 1st day of May, 2021.

| | |
|---|---|
| **Midway Software Systems, LLC**<br>**Mustang Software, LLC** | **Mojo Consultants Inc.** |
| ______________________________<br>Signature | ______________________________<br>Signature |
| ______________________________<br>Name Printed | ______________________________<br>Name Printed |
| ______________________________<br>Title | ______________________________<br>Title |

**AMENDMENT TWO**
**TO**
**EXCLUSIVE SOFTWARE LICENSE AGREEMENT**

WHEREAS, Midway Software Systems, LLC ("MIDWAY") and Southwest Sweepstakes, LLC ("OPERATOR") entered into an Exclusive Software License Agreement ("Agreement") ON April 28, 2018, and

WHEREAS, Amendment One ("Amendment") was signed May 1, 2021;

THEREFORE, the parties agree as follows:

1. Amendment Two will add Jarvis Three, LLC ("JARVIS") along with MIDWAY, MUSTANG, and OPERATOR.
2. SRTs running JARVIS software and installed by OPERATOR will count towards the required minimum SRTs installed each year.
3. OPERATOR will pay twenty-five (25) percent of Net Revenue as defined in Section 7a of Agreement derived from within the OPERATOR's Customers' locations. This will start with the billing cycle for week ending May 9, 2021.
4. OPERATOR will pay twenty (20) percent of Net Revenue as defined in Section 7a of Agreement derived from outside of the OPERATOR's Customers' locations.

All other parts of the Agreement and Amendment remain unchanged.

This Amendment One shall take effect on this 4th day of May, 2021.

**Midway Software Systems, LLC**
**Mustang Software, LLC**
**Jarvis Three, LLC**

____________________________________
Signature

____________________________________
Name Printed

____________________________________
Title

**Mojo Consultants Inc.**

____________________________________
Signature

____________________________________
Name Printed

____________________________________
Title

# AMENDMENT THREE
# TO
# EXCLUSIVE SOFTWARE LICENSE AGREEMENT

This Third Amendment ("Amendment Three") with an effective date March 10, 2025, is made and entered into by and among Midway Software Systems, LLC ("MIDWAY"), Mustang Software, LLC ("MUSTANG"), 239 Software, LLC ("239SOFT"), Jarvis Three, LLC ("JARVIS"), Mojo Consultants, Inc. ("MOJO"), Semper Fido Sweepstakes LLC ("Semper Fido"), and SFS IT Services Inc. ("SFS IT"). Each of the foregoing may be referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Parties (or their predecessors in interest) previously executed that certain Exclusive Software License Agreement with an effective date of April 28, 2018 (the "Original Agreement");

WHEREAS, the Parties (or their predecessors in interest) subsequently executed Amendment One on or about May 1, 2021, and Amendment Two on or about May 4, 2021, modifying certain terms of the Original Agreement (collectively, the Original Agreement, Amendment One, and Amendment Two are hereinafter referred to as the "Agreement");

WHEREAS, the Parties desire that MOJO, previously the sole OPERATOR, withdraw from the Agreement and that Semper Fido and SFS IT stand in MOJO's place, thereby being the assignee of the locations stated in the Attachment A and B, and assuming all rights and obligations of OPERATOR under the Agreement;

WHEREAS, the Parties desire to reaffirm and ratify the Agreement and all of its terms, as previously amended, except as expressly modified by this Amendment Three; and

WHEREAS, the Parties now wish to enter into this Amendment Three to further modify certain terms of the Agreement;

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

1. **Incorporation of Recitals.** All recitals set forth above are hereby incorporated by reference and made part of this Agreement as if fully set forth herein. The Parties agree that these recitals constitute material terms of this Agreement.

2. **Addition of 239 Software, LLC.**
   a. 239 Software, LLC ("239SOFT") is hereby added as a Party to the Agreement and shall have the same rights and duties pursuant to the Agreement as MIDWAY, MUSTANG, and JARVIS. As of the effective date of this Amendment Three, Mustang, Jarvis, and 239 SOFT shall be jointly and severally agree to be liable for the full and faithful performance

for all of the duties, liabilities, and obligations required of MIDWAY under the Original Agreement and shall be subject to the same terms and conditions applicable to MIDWAY.

b. As of the effective date of this Amendment Three, 239SOFT assumes, agrees to perform, and be fully responsible for all rights, duties, liabilities, and obligations required of MIDWAY under the Agreement, including any rights or obligations arising under or relating to amendments thereto, and shall be subject to the same terms and conditions applicable to MIDWAY.

c. The Parties agree that 239SOFT will provide kiosks that will run 239SOFT 's software and be installed by OPERATOR at locations chosen by OPERATOR..

d. For revenue derived from OPERATOR's Customers' locations utilizing 239SOFT software, OPERATOR shall pay twenty-five percent (25%) of Net Revenue, as defined in Section 7(a) of the Original Agreement. This will start when the first kiosk is placed in the field.

3. **Removal of MOJO Consultants, Inc. and addition of Semper Fido Sweepstakes and SFS IT Services.**
   a. As of the effective date of this Third Amendment, MOJO is hereby removed as a Party/Parties to the Agreement in all respects and is relieved of any future rights, duties, or obligations. However, MOJO remains liable for any and all obligations or liabilities that accrued prior to March 10, 2025.
   b. Semper Fido and SFS IT are hereby added as Parties to the Agreement.
   c. As of the effective date of this Amendment Three, Semper Fido and SFS IT jointly and severally agree to be liable for the full and faithful performance for all of the duties, liabilities, and obligations required of OPERATOR under the Agreement and shall be subject to the same terms and conditions applicable to OPERATOR.

4. **Semper Fido Locations.**
   a. Attachment A to this Amendment Three sets forth the locations which Semper Fido will operate. At Semper Fido's discretion, it may add or delete locations from Attachment A.

5. **SFS IT Services Locations.**
   a. Attachment B to this Amendment Three sets forth the locations which SFS IT will operate. At SFS IT's discretion, it may add or delete locations from Attachment B.

6. **Termination.** The Agreement shall terminate on April 28, 2026, unless terminated earlier in accordance with the terms of the Original Agreement..

7. **Ratification of Agreement.** The Parties agree that except as expressly modified by this Amendment Three, all other provisions, obligations, and rights set forth in the Original Agreement, Amendment One, and Amendment Two (collectively, the "Agreement") remain unchanged and in full force and effect. The Parties hereby reaffirm and ratify the Agreement,

recognizing that no term, covenant, or condition is waived or modified other than as specifically stated in this Amendment Three.

8. **Authority to Execute and Perform.** Each Party represents and warrants that it has the legal capacity, power, and authority to enter into and fully perform its obligations under this Agreement and it has obtained all required consents and approvals necessary to execute this Agreement.

9. **Effective Date.** The effective date of this Amendment Three is March 10, 2025, regardless of the date of the last signature below.

10. **Counterparts and Electronic Signatures.** This Amendment Three may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Signatures transmitted electronically or by facsimile shall be treated as original signatures for all purposes.

11. **Release of Required Minimums.** The OPERATOR shall be released from the requirement that OPERATOR install a minimum number of SRTs during each of the five (5) year of Amendment One, and from the requirement that OPERATOR have a total of seven hundred fifty (750) SRTs at the end of the five (5) year extension of Amendment One, provided, however, that OPERATOR shall use its best efforts to maintain the current level of SRTs and Net Revenue.

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment Three to be executed by their duly authorized representatives as of the date(s) set forth below.

MIDWAY SOFTWARE SYSTEMS, LLC;
MUSTANG SOFTWARE, LLC;
239 SOFTWARE, LLC, AND
JARVIS THREE, LLC

By: [signature]
Name: D. Bradly Olah
Title: Managing Member
Date: March 11, 2025

SEMPER FIDO SWEEPSTAKES

By: [signature]
Name: Morris Joseph
Title: Managing Member
Date: 3/11/25

SFS IT SERVICES

By: [signature]
Name: Morris Joseph
Title: Managing Member
Date: 3/11/25

MOJO CONSULTANTS, INC.

By: [signature]
Name: Morris Joseph
Title: Managing Member
Date: 3/11/25

# ATTACHMENT A

**Semper Fido Sweepstakes LLC**

American Legion 2
American Legion 17
American Legion 19
American Legion 37
American Legion 50
American Legion 55
American Legion 58
American Legion 75
American Legion 79
American Legion 83
American Legion 93
American Legion 96
American Legion 101
American Legion 121
American Legion 133
American Legion 165
American Legion 172
American Legion 177
American Legion 179
American Legion 205
American Legion 208
American Legion 223
American Legion 243
American Legion 245
American Legion 273
American Legion 283
American Legion 297
American Legion 317
American Legion 321
American Legion 322
American Legion 363
American Legion 399
American Legion 408
American Legion 410
American Legion 424
American Legion 437
American Legion 443
American Legion 447
American Legion 453
American Legion 493
American Legion 517
American Legion 522

American Legion 539
American Legion 569
American Legion 573
American Legion 579
American Legion 592
American Legion 597
American Legion 828
Catholic War Veterans
Fraternal Order of Eagles 70
Fraternal Order of Eagles 3864
Fraternal Order of Eagles 4128
VFW Post 2772

# ATTACHMENT B

**SFS IT Services Inc.**

Angry Armadillo
Barnstorm
Bingo Bingo
Bodhi's Hideaway
Boots
Cedar Park Pub
Cheerz
Chunky Monkey
Club Oasis
Common Interest
Copper Top Tavern
FTG Legends
Goat Locker Bar
Happy Hour Bar
Hometown Watering Hole
Jackalope Southshore
Keith's Place
Last Call Pflugerville
Legends
Lonestar
Lonestar Pflugerville
Midway Pub
Midway 2
Mill, The
Palm, The
Pflutos
Pflutos II
Raggedy Ann's
Rotunda Bar
Round Rock Tavern
Rudy's Bar & Grill
Rumors on the Lake
Salty Crab Tavern
Sunset Bar
Third Base
Top Spin
Victory Tap, The
Water Tank, The
Weenie Mart
Whiskey Girls